**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-01370-SBP

GODWILL MANGAYI,

Plaintiff,

v.

COLORADO DEPARTMENT OF HUMAN SERVICES,

Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

**Susan Prose, United States Magistrate Judge**

Plaintiff Godwill Mangayi, a Black man of African national origin, was not selected for a position with Defendant Colorado Department of Human Services ("CDHS"). In the instant matter, Mr. Mangayi alleges that decision constitutes unlawful discrimination on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act.[1] CDHS has moved for summary judgment on Mr. Mangayi's remaining Title VII claim. (ECF No. 38.) Mr. Mangayi has responded, and CDHS has replied (ECF Nos. 44, 49.) The court heard oral argument on the Motion. (ECF No. 56.) The court has jurisdiction pursuant to 28 U.S.C. § 1331.

The undersigned magistrate judge fully presides over this case pursuant to 28 U.S.C.

---

[1] The court previously dismissed Mr. Mangayi's claim under the Colorado Anti-Discrimination Act on grounds of Eleventh Amendment immunity, with final judgment on that claim to be entered at the conclusion of the case. (*See* ECF No. 32.)

§ 636(c)(1), the parties' consent, and the Order referring the case for disposition to this judicial officer (ECF Nos. 13, 16). For the reasons set forth below, the court now finds that the undisputed evidentiary record demonstrates no material issues of fact supporting discrimination in CDHS's decision not to hire Mr. Mangayi. The court accordingly respectfully **GRANTS** the Motion for Summary Judgment and **DENIES as moot** CDHS's Motion to Exclude Expert Testimony of Plaintiff Regarding Front Pay. (ECF No. 37.)

## UNDISPUTED FACTS

As a preliminary matter, Mr. Mangayi's response to the Motion for Summary Judgment does not address CDHS's Statement of Undisputed Material Facts ("SUMF"). (*See* ECF No. 38 at 2-22; *see also* ECF No. 44 (no reference in response brief to these facts).) CDHS argues that Mr. Mangayi thus has failed to raise a genuine dispute as to any fact CDHS has set forth because he did not oppose them in the manner required by Federal Rule of Civil Procedure 56(c) and this court's Uniform Civil Practice Standards. (*See* ECF No. 49 at 2; *see also* Uniform Civil Practice Standards for Magistrate Judges (Prose), § V(10) at 15 ("Any party opposing the motion for summary judgment shall include a separate section in its response admitting or denying each of the moving party's undisputed facts.").) CDHS therefore urges that each of its undisputed facts should be deemed admitted. (ECF No. 49 at 2-3 (citing *Am. Auto. Ins. Co. v. Marlow*, 666 F. Supp. 2d 1209, 1212-13 (D. Colo. 2009) (declining to "overlook the . . . defendants' failure to admit or deny the facts contained in [plaintiff's] statement of undisputed facts," and deeming those facts admitted))); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"); *Beard v.*

*Banks*, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [the plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement.").[2]

CDHS accurately states the law. The court therefore accepts as true and unopposed all material facts asserted and properly supported in the Motion for Summary Judgment, and it similarly deems true the facts in Mr. Mangayi's response for which he has provided proper evidentiary support under Rule 56(c). (*See* ECF No. 44 at 4-20.) Pursuant to these governing legal standards, the following material facts, which are undisputed unless otherwise noted, are drawn from the record and are construed in Mr. Mangayi's favor:

## I. Mr. Mangayi's Application for the Policy Advisor IV Position

The crux of Mr. Mangayi's case is that CDHS did not select him for a policy advisor position and instead selected a white woman, Elizabeth Nash, who in Mr. Mangayi's view was less qualified than him. Mr. Mangayi asserts that the selection of Ms. Nash was motivated by discrimination based on his race and national origin, which he asserts was reflected at multiple steps of the hiring process. The court therefore begins by setting forth the material facts concerning each stage of that process.

### A. Posting for the Position and Initial Screening

On April 5, 2023, the Division of Child Support Services (the "Division") posted an opening for a Policy Advisor IV position in the Policy Unit within the Division. (SUMF ¶ 1.) The Policy Unit "leads the Colorado Child Support Services (CSS) program," and CDHS states that its purpose is "to implement federal requirements of

[2] After being advised of this deficiency, Mr. Mangayi did not request to supplement his response.

Title IV-D of the Social Security Act, continuously improve the operation of Colorado's CSS program by designing and implementing changes to Colorado law, state rules and procedures, and provide quality supervision and guidance to 54 county CSS programs to maximize their ability to provide quality CSS services to the public and increase child support collections." (*Id.* ¶ 2.) As for the Policy Advisor IV position specifically, its purpose "is to act as the staff authority on policy, procedure, and regulation for the Division of Child Support Services and to provide county support in the assigned areas for the administration of the child support services program." (*Id.* ¶ 4.)

The April 2023 posting for the Policy Advisor IV position articulated "Minimum Qualifications" that included: "Three (3) years of professional experience in policy analysis, project management, or working in the Child Support Services program." (SUMF ¶ 63; *see also* ECF No. 38-1 at 2.) The person assuming the role of Policy Advisor IV would be assigned as the staff authority in the child support areas of "Establishment, Paternity, Guidelines, Modification" and would be charged with "policy analysis, implementation, and skills related to these programmatic subject areas." (SUMF ¶¶ 64-66; *see also* ECF No. 38-1 at 2 (listing among the "Preferred Qualifications" for the job "Experience with analyzing, implementing and evaluating policy, legislation and/or regulations").) "Preferred Qualifications" also included "[e]xperience with the Automated Child Support Enforcement System (ACSES)" and "[t]echnical assistance and/or training experience." (ECF No. 38-1 at 2.)

The April 5, 2023 posting stated that it might be used "to fill both permanent and substitute positions." (*Id.*) If used to fill a substitute, or "S" position, that position would "not

exceed nine months in duration," and then the selected employee would "continue to receive benefits and leave during this training period and will be transferred to the permanent position once the current incumbent retires." (*Id.*) That "incumbent" was an employee named Mary Clair, who then held the Policy Advisor IV position and whose retirement was imminent at the time of the posting. (SUMF ¶¶ 20, 21.)

Mr. Mangayi applied for the Policy Advisor IV position. (*Id.* ¶ 7.) After his application was found to meet the minimum qualifications by CDHS's Human Resources Department, he was referred to the CSS program for a two-part "comparative analysis" phase, which included a "structured application review" and phone screen to rank and select candidates for interviews. (*Id.* ¶¶ 8-11; *see also* ECF No. 44-1, Batchelder Dep.[3] 49-50, 151:24-152:7).) Ms. Nash had the highest score on the structured application review. (ECF No. 44-1, Batchelder Dep. 54, 156:14-17.) Mr. Mangayi came in second. (*Id.* at 53-54, 151:24-152:7.) He was one of twelve candidates selected for the phone screen component of the comparative analysis phase. (SUMF ¶¶ 39, 55.)

### B. Pre-Phone Screen Communications

After the April 5, 2023 posting, Ms. Hughes sent a message via the Automated Child Support Enforcement System ("ACSES") concerning the open Policy Advisor IV position. (ECF

[3] Excerpts from Ms. Batchelder's deposition are part of the summary judgment record at ECF Nos. 38-13, 44-1, and 49-3. Mr. Mangayi argues that the transcript of Ms. Batchelder's deposition "blends Rule 30(B)(6) testimony with the Deputy Director's testimony. Given the Deputy Director's high-level position with DHS, her testimony is imputed to DHS in any event." (ECF No. 44 (citing Fed. R. Civ. P. 32(a)(2).) The distinction between Ms. Batchelder's deposition in her individual capacity and in her capacity as a Rule 30(b)(6) designee (or a "managing agent" under Rule 32(a)(3)) has no impact on the court's analysis here. Accordingly, the court examines the substance of Ms. Batchelder's undisputed statements, including her assessment of the superiority of Ms. Nash's qualifications over Mr. Mangayi's.

No. 38-4, Hughes Decl. ¶ 4.) ACSES is the system used by the Child Support Services Program to manage its caseload. (SUMF ¶ 105.) A record of all child support case-related data is maintained in ACSES. (*Id.* ¶ 106.)

Ms. Hughes's ACSES message, which she sent to "CSS professionals," stated:

> The purpose of the Policy Advisor IV position is to act as the staff authority on policy, procedure, and regulation for the Division of Child Support Services and to provide County support in assigned areas for the administration of the CSS Program.

(ECF No. 38-6 (referencing https://www.governmentjobs.com/careers/colorado/jobs/3991152/child-support-policy-advisor-IV).). Ms. Nash, who was employed by the Division, would have received that message, as would have Mr. Mangayi, who worked as a child support enforcement officer with Arapahoe County Child Support at the time. (*See* Hughes Decl. ¶ 4 ("All County candidates or potential candidates who worked in the child support program in Colorado would have received the message I sent via the Automated Child Support Enforcement System (ACSES), and would have been able to use ACSES to obtain my email address."); *see also* ECF No. 38-15, Mangayi Dep. 25:8-13; SUMF ¶ 84.)

Ms. Nash contacted Ms. Hughes, and Ms. Hughes spoke with her "via Google Meet, discussing the Policy Advisor position and the nature of the Unit's work." (Hughes Decl. ¶ 2.) Another potential candidate contacted Ms. Hughes by email. (*Id.* ¶ 3.) Although Mr. Mangayi had access to ACSES, he did not reach out to Ms. Hughes. (*Id.* ¶ 7.) Ms. Hughes avers that, had Mr. Mangayi contacted her, she "would have spoken with him or replied to his emails with the same information that I provided to other candidates or potential candidates." (*Id.* ¶ 8.)

Ms. Sage-Lowe and Ms. Clair, who were members of the panel, also spoke with Ms. Nash about the position before the phone screen. (*See* ECF No. 38-14, Sage-Lowe Decl. ¶ 6.) Their discussion was incidental to another work-related meeting in which the three had participated. (*Id.*) Ms. Sage-Lowe attested that she "was happy to share that information with potential candidates" about posted positions, and that "[i]f any other potential candidate for the April 2023 Policy Advisor IV position posting, including Mr. Mangayi, had contacted me to ask about the position, I would have been happy to speak with them." (*Id.* ¶ 12.) Mr. Mangayi did not contact Ms. Sage-Lowe. (*Id.* ¶ 13.) Nor is there any evidence that he contacted Ms. Clair.

**C. Scheduling the Phone Screens**

On May 9, 2023, following the structured application review component of the comparative analysis phase, Mr. Mangayi was informed by email that he would be contacted to schedule a phone screen. (*See* SUMF ¶ 11; *see also* ECF No. 38-11 ("I am pleased to inform you that your application has moved forward to the next stage of review which will include a phone screen review. The hiring manager or someone on their team will be reaching out with next steps in the process.").)

On May 10, 2023, commencing at 6:42 a.m., Tracy Lewis, a Division Program Assistant, sent emails to twelve candidates, including Mr. Mangayi, offering each a twenty-minute slot on Thursday, May 11—or, in the alternative, "today in the afternoon Wednesday May 10, 2023"—for a "video interview[] for the Policy Advisor position with the CDHS Division of Child Support Services." (ECF No. 38-16 at 64; SUMF ¶ 56.) The emails mistakenly described the phone screen as a "video interview[]." (SUMF ¶ 57.) The emails were sent within twenty-five minutes of each other, in alphabetical order by the candidate's last names. (*Id.* ¶ 39.) Ms.

Batchelder testified that an effort was made to quickly schedule the phone screen because "it had taken an extensive amount of time to create" the new position, and because Ms. Clair's retirement was "fast approaching" and "we wanted to hopefully have someone hired to minimally shadow Ms. Clair for maybe 30 days." (ECF No. 38-13, Batchelder Dep. 11-12, 186:24-187:8; *see also* ECF No. 44-1, Batchelder Dep. 23, 79:11-13 ("When the S position was created, our understanding was that [Ms. Clair] was retiring July 31st of 2023."); *id.* 23-24, 79:24-80:1 (noting that Ms. Clair "had 20 years of institutional knowledge, and we felt like it was important for somebody to work alongside her prior to retiring").)

Mr. Mangayi responded to Ms. Lewis's morning email at 1:45 p.m. (ECF No. 38-16 at 64.) Within four minutes, Ms. Lewis replied and informed him that the times he had chosen for Thursday, the next day, were taken, but that he could select "an earlier time for Thursday" or 3:40 p.m. that day, Wednesday, May 10. (*Id.* at 65.) Mr. Mangayi selected 3:40 p.m. that day. (*Id.* (1:58 p.m. email from Mangayi to Lewis stating that "[t]oday at 3:40 pm would work as well").)

**D. Mr. Mangayi's Phone Screen**

The phone screen panel was compromised of five women, all of whom are white: Keri Batchelder, the Deputy Director of the Division and the hiring manager for the April 2023 job posting; Jeana Hughes, the Lead Policy Advisor who had accepted the position of Policy Unit Manager and would be tasked with managing the soon-to-be-hired Policy Advisor IV; Lisa Sage-Lowe, a Policy Advisor IV in the Policy Unit; Kathryn Lepome, a Policy Advisor V whose role was to advise the Child Support Commission; and Ms. Clair, a Policy Advisor IV whose imminent retirement had precipitated the posting. (SUMF ¶¶ 15-21.)

Mr. Mangayi points to several alleged logistical irregularities in the manner his phone screen was conducted. The court delineates here the undisputed material facts concerning each purported procedural irregularity.

***Weather on the day of the phone screen.*** When Mr. Mangayi's phone screen began, one of the panel members was not present. (SUMF ¶ 32.) Ms. Hughes explained to Mr. Mangayi that Ms. Sage-Lowe was unable to join at that moment because she had received notice of a tornado warning. (*Id.* ¶ 35.)

Mr. Mangayi then "mention[ed]" that he was also located in the tornado warning area, and he complains now that he should have been allowed to reschedule the phone screen. (Mangayi Dep. 9, 142:14-16 ("I did mention at that point that I'm on the tornado warning as well and I felt also that I could have been given the courtesy to be given that okay, he can reschedule because it was really intense and we didn't know where the tornado was coming from.").) However, when Ms. Hughes asked Mr. Mangayi if he wished to stop the phone screen, he declined the offer/suggestion. (*Id.* 10, 143:11-15.)[4] Ms. Hughes testified that "Mr. Mangayi did not tell us he needed to stop the phone screen due to the weather nor did Mr. Mangayi request to reschedule his phone screening due to the weather." (Hughes Decl. ¶ 23.) Had he done so, "we would have accommodated that request." (*Id.* ¶ 24.) Notwithstanding the tornado in her area, Ms. Sage-Lowe joined the phone screen before any of the four scripted questions were asked of Mr. Mangayi. (SUMF ¶ 38; *see also* Sage-Lowe Decl. ¶ 18 (when Sage-Lowe "logged back onto

---

[4] While unspoken on Mr. Mangayi's part, he apparently expected to hear something more from Ms. Hughes. As he put it, "I didn't want to stop [the screen] because she didn't give me an alternative." (Mangayi Dep. 10, 143:111-12.)

Google Meet for Mr. Mangayi's phone screening, Ms. Hughes was finishing up the introduction portion of the script and none of the four questions we had prepared had been asked").)

***Video cameras during the phone screen.*** At the start of each phone screen, Ms. Hughes read a script introducing the candidate to the screening panel and the screening process. (SUMF ¶ 58.) Because Ms. Lewis's email erroneously identified the phone screen as a video interview, Ms. Hughes addressed that point in her opening remarks: "We will not have our cameras on today; so, we want to welcome you to turn your camera off, as well, if you would like." (ECF No. 38-20, Policy Advisor Phone Screen Questions 1; *see also* SUMF ¶ 59.)

Mr. Mangayi started the phone screen with his camera turned on, but turned it off after Ms. Hughes advised him that he could. (SUMF ¶ 60; Mangayi Dep. 8, 141:14-15.) Several other candidates did the same. (SUMF ¶¶ 61-62; *see also* Sage-Lowe Decl. ¶ 20 ("Most candidates started with their cameras on for the phone screen. After Ms. Hughes read the introduction portion of the script, which invited people to turn their cameras off if they would like, some candidates chose to leave their cameras on, and others turned their cameras off.").) Mr. Mangayi found the issue with the video camera "odd" because, in his view, "there was no justification for that." (Mangayi Dep. 9, 141:14-18.)

***The scripted screening questions and criteria for evaluating the answers.*** During the phone screen, each candidate was asked the same four questions, by the same panel members:

1. Given your current understanding of the position, what do you expect from this role as a policy advisor and why are you interested in the position?- Jeana [Hughes]

2. What policy analysis, implementation and/or evaluation skills do you have that might set you apart from other candidates?- Kathryn [Lepome]

3. If 80% of your job was spent in a way that best used your strengths and 20% was spent on tasks that drained your energy, what would you be doing during the 80% and 20%? Lisa [Sage-Lowe]
4. What motivates you at work?- Mary [Clair]

(*See* SUMF ¶ 43; *see also* ECF No. 38-20 at 1.) The introduction to the phone screen, the four questions, and the closing comments were scripted, and each section or question was read by the same panel member during each candidate's phone screen. (SUMF ¶ 51.) The panel then rated the candidates' answers pursuant to the following scale:

| **Phone Screen Rating Scale** | | |
|---|---|---|
| **Scale** | **Competency Level** | **Explanation of Level** |
| 1 | **Novice** | Minimal knowledge or experience with learning in subject |
| 2 | **Advanced beginner** | Has adequate knowledge and some experience, but lack[s] fluency in application |
| 3 | **Competent** | Detailed knowledge and experience with topic or skill, able to apply knowledge fluently |
| 4 | **Proficient** | Utilizes knowledge, past experiences, critical thinking and reflection to apply knowledge fluently to situation |
| 5 | **Expert** | Ha[s] advanced knowledge, critical thinking skills and leadership, demonstrates a deep understanding and intuitive grasp of total situation |

(ECF No. 44 at 17, ¶ 61.)[5]

Mr. Mangayi viewed the panel as being "dismissive" of his candidacy because they did not ask him any follow-up questions. (Mangayi Dep. 10-11, 143:19-144:1.) Although he asserts the other candidates "were asked to clarify their responses, and "[s]o more than four questions were asked to other applicants," he provides no evidence concerning the identity of those candidates and the additional questions they were asked. (*Id.* 11, 144:12-14.) Ms. Hughes stated

[5] The same rating scale was used to score the structured application review. (ECF No. 44 at 7, ¶ 30.)

that there was only one exception to a candidate being asked more than the four scripted questions: if the "candidate did not provide a responsive answer to a scripted question and a panelist rephrased the scripted question in an attempt to obtain a responsive answer." (*See* Hughes Decl. ¶ 12; SUMF ¶¶ 44-45.) Thus, any rephrased questions were intended to solicit the same information as the four listed questions. (SUMF ¶ 46.)

***Length of Mr. Mangayi's phone screen.*** Mr. Mangayi's phone screen lasted about fifteen minutes of the total allotted twenty minutes, and he believes his "scores were affected by that." (SUMF ¶ 48; Mangayi Dep. 11, 144:7-9; 19-24.) Other phone screens were as short as ten to twelve minutes, and none went over twenty minutes. (SUMF ¶ 49.) Ms. Hughes described Mr. Mangayi's phone screen as "similar in length to several other candidates and . . . neither exceptionally long nor exceptionally short." (*Id.* ¶ 50; *see also* Hughes Decl. ¶ 11.)

## II. The Panel's Assessment of Ms. Nash's and Mr. Mangayi's Respective Qualifications

### A. Ms. Nash

At the time Ms. Nash submitted her application, she had six years of experience working as an Establishment and Modification technician for the Weld County Department of Human Services, where she managed a "child support establishment and modification caseload according to State of Colorado guidelines and time frames." (*See* SUMF ¶ 72; ECF No. 38-23, Nash Application 2; ECF No. 38-4, Nash Cover Letter 1.) From April 2020 to April 2022, Ms. Nash worked as a Child Support Resource Specialist or "lead worker" for the Weld County Department of Human Services, in which she "[m]an age[d] [a] confidential caseload and provide[d] coverage of vacant caseloads as needed," including in the areas of "Establishment, Enforcement, Case Initiation, and Interstate." (*See* SUMF ¶ 71; Nash Application 2.) In April

2022, Ms. Nash transitioned to the State Division of Child Support Services, where she took a position as an "ACSES Operations Analyst III," "[s]erv[ing] as subject matter expert on the operation of the ACSES relating to case functions." (Nash Application 1.) Ms. Nash was working in that role when she applied for the Policy Advisor IV position in April 2023. Since 2014, Ms. Nash has maintained an Administrative Process Action, or "APA" certification, which "is required to conduct administrative process in child support. It's a process where you can meet with clients and establish orders administratively without judicial involvement." (ECF No. 38-22 Nash Dep. 2, 9:19-24; Nash Application 2; SUMF ¶¶ 73, 87.)

Ms. Nash also had experience interpreting regulations, statutes, and policy. (Nash Application 5; Nash Cover Letter; SUMF ¶¶ 95-97.) With regard to Ms. Nash's policy experience specifically, Ms. Hughes looked favorably on Ms. Nash's work as an Operations Analyst with the Division, which included "developing business rules to implement changes to [child support] policy." (ECF No. 38-2, Hughes Dep. 10-11, 91:10-92:2.) Ms. Hughes explained that when there are changes to legislation governing how child support obligations are calculated, Operations Analysts like Ms. Nash "help to write the business rules to define what [ACSES] needs to do based on the legislation," a process that involves "interpreting a lot of policy and translating that into [] a language that developers can understand." (SUMF ¶¶ 100-101.) Ms. Batchelder, the Deputy Director of the Division and the hiring manager for the April 2023 job posting, similarly emphasized Ms. Nash's experience in the policy arena. (*Id.* ¶ 102 (observing that Nash "was involved with the implementation of some changes to our guideline statute while she was an operations analyst with the state office"); ECF No. 38-1, Batchelder Dep. 9-10, 167:25-168:5 (noting that Nash had "review[ed] business rules to ensure . . . that the

system complies with policy" and that she had "update[d] interstate payment processing" of child support payments).)

Ms. Nash had subject matter and technical expertise with ACSES, a "Preferred Qualification" in the position announcement. (*See* ECF No. 38-1 at 2; Nash Application 1 (describing Nash's experience with ACSES, including "serving as subject matter expert on the operation of the ACSES relating to case functions") (citation modified); SUMF ¶¶ 113-114.) Beginning in 2007 and throughout her career, Ms. Nash has provided training to others, another of the "Preferred Qualifications" for the Policy Advisor IV position. (*See* ECF No. 38-1 at 2; *see also* Nash Cover Letter 1-2 (listing training experience, including "developing and presenting education materials to user groups about ACSES processes") (citation modified); SUMF ¶¶ 118-123.)

During the phone screen, Ms. Nash was able to articulate specific examples of her expectations for the Policy Advisor IV position. She explained that she anticipated reading and analyzing statutes and rules, providing guidance and training to counties, and answering questions on a daily basis. (*See* SUMF ¶ 136; ECF No. 38-25, Lepome Notes of Nash Phone Screen 3; ECF No. 38-27, Batchelder Notes of Nash Phone Screen 3; ECF No. 38-28, Sage-Lowe Notes of Nash Phone Screen 2.) Ms. Nash cited specific examples of her prior policy, analysis, implementation, and evaluation skills that she believed would set her apart from other candidates, including experience working on business rules, interstate payment processing, and ACSES. (*See* SUMF ¶ 137; Lepome Notes 3; Batchelder Notes 3; Sage-Lowe Notes 3.)

Ms. Hughes, who would serve as the manager for the person selected as the Policy Advisor IV, concluded that Ms. Nash was the most qualified candidate among those who were

interviewed because Ms. Nash (1) had "county-level experience in the child support program in the areas of Establishment, Paternity, Guidelines, and Modification" and "experience in many other program areas, including Enforcement"; (2) "had policy-related experience"; and (3) had "some of the preferred qualifications" for the position, including (a) "substantial training experience as she described in her application materials" and in connection with her partnering "with a Policy Advisor in the Unit to deliver training related to ACSES during the Administrative Process Action (APA) Certification Training" and (b) "extensive ACSES experience as a county-level ACSES liaison and with the Division as an Operation[s] Analyst." (Hughes Decl. ¶¶ 33(a)-(c).) Ms. Nash's application papers support this assessment.

**B. Mr. Mangayi**

Mr. Mangayi characterized his fifteen years in child support services as related to "Case Management and Enforcement" and described his current role in Arapahoe County as a "child support enforcement officer." (*See* SUMF ¶¶ 83-84; ECF No. 38-26, 11/22/2024 Responses to Defendant's First Written Discovery Requests to Plaintiff 3.) Before taking a position with Arapahoe County, Mr. Mangayi worked with a company called Young Williams, "a contracted company offering child support services in El Paso County for El Paso County," where his role "was in enforcement, collecting child support for, you know, paid orders." (Mangayi Dep. 6, 88:9-19.)

Mr. Mangayi's application papers and phone screen responses reflected limitations in his policy-related experience. In response to the application question asking him to "[d]escribe in detail your experience interpreting regulations, statutes, and policy to determine compliance, provide guidance, and/or to direct operations," Mr. Mangayi focused on his tenure "as an

Enforcement Officer for the British Columbia Family Maintenance Enforcement Program." (ECF No. 38-7, Mangayi Application 5.) Mr. Mangayi described specific aspects of Canadian law regarding enforcement of child support orders, including differences between laws in Quebec and British Colombia, but his response did not specifically address how that work reflected experience in interpreting regulations, statutes, and policy. (*See id.*; *see also* SUMF ¶ 93.) While Mr. Mangayi's cover letter expressed a "commitment to policy and processes improvement" (ECF No. 38-8 at 6), it did not reference any policy-related experience. (*See id.* at 5-6; *see also* SUMF ¶ 94.) Unlike Ms. Nash, Mr. Mangayi does not have Administrative Process Action certification, which is required to conduct administrative process in child support and establish orders administratively without judicial involvement. (Mangayi Dep. 2, 23:2-9.)

As to the "Preferred Qualifications" for the Policy Advisor IV role, Mr. Mangayi represented that, as an end user of ACSES, he has "good knowledge of ACSES" and "proficiency in ACSES" (*see* Mangayi Application 5; Mangayi Cover Letter 5), and that he had "maintained, monitored, and updated . . . (ACSES) and Electronic Document Management System on a daily basis with pertinent case information." (Mangayi Application 2.) As for his experience training others, Mr. Nash identified one example: "I had an opportunity to present via zoom training on enforcement measures to new coworkers at Arapahoe County where I also attended training." (*See* Mangayi Application 6; *see also* SUMF ¶¶ 116-117.)

In evaluating Mr. Mangayi's qualifications, Ms. Hughes observed that, during the phone screen, he "did not answer all of the questions clearly or concisely," and "that he repeated some parts of his answers to one question when answering the next." (Hughes Dep. 16, 164:3-9.) In response to two of the four scripted questions, Mr. Mangayi "just explained that he has years of

county experience and just talked about his experience in the county and in other states and in the child support program." (*Id.* 16, 164:19-23.) Ms. Hughes's impression was that this "[w]asn't necessarily responsive to the questions, and it kind of indicated that he didn't have a clear or a structured understanding of how that experience would relate to the policy advisor position." (*Id.* 16-17, 164:23-165:2.) In summarizing her concerns about Mr. Mangayi's candidacy, Ms. Hughes stated that, while Mr. Mangayi "expressed that he had years of child support experience, he failed to showcase how that could be applied in a policy advisor role, and the repeating of answers raised concern that he didn't know how his experience exactly could relate in the context of a policy advisor position." (*Id.* 18, 173:10-18; *id.* at 19, 181 (errata for "[t]ypographical errors" in the deposition transcript); *see also* SUMF ¶¶ 125-126.)

Ms. Batchelder took note of Mr. Mangayi's statement from the phone screen that what he expected from the Policy Advisor IV role "was that he would be expected to view policy and procedure at a macro level and that he could utilize his micro-level experience in policy and regulation development. But he wasn't saying that he had macro-level policy and procedure experience." (*See* ECF No. 38-13, Batchelder Dep. 15, 221:1-9; *see also* SUMF ¶ 127.) Ms. Batchelder also testified that she gave Mr. Mangayi a low score of "1.5" in response to question number 2 of the scripted questions—"What policy analysis, implementation and/or evaluation skills do you have that might set you apart from other candidates?"—because, in her view, "he essentially repeated his experience from above. It did not speak to his policy analysis, policy implementation, or policy evaluation skills, and so in using the rubric to assess his competency on that question, I think I rated him a sort of a novice to advanced beginner level." (ECF No. 38-13, Batchelder Dep. 16-17, 223:25-224:8; *see also* Batchelder Notes 1.)

Ms. Sage-Lowe observed that, while "Mr. Mangayi had many years of experience in child support services, . . . during the phone screening, he did not effectively demonstrate how that experience would make him a good candidate for the Policy Advisor IV positions posted." (Sage-Lowe Decl. ¶ 25; SUMF ¶ 129.) Ms. Sage-Lowe further stated that, "[d]espite his many years of experience, Mr. Mangayi did not appear to have an increasing level of responsibility over the years." (Sage-Lowe Decl. ¶ 26.) She also testified regarding her observation that Mr. Mangayi did not appear to understand the purpose of the position for which he was applying because "[d]uring his phone screen, Mr. Mangayi referred to his interest in research and investigating but did not discuss his expectations of the role as a Policy Advisor or how his prior experience would prepare him for a role as a Policy Advisor." (*Id.* ¶ 27.) Although "Mr. Mangayi used broad terms like policy and research," in Ms. Sage-Lowe's view he "did not demonstrate that he had a true understanding of the position." (*Id.*; *see also* SUMF ¶¶ 130-131.)

Based on Mr. Mangayi's application materials and statements he made during his phone screen, the panel members understood his child support services program experience to have been primarily in the enforcement arena. (*See* SUMF ¶ 78; ECF No. 38-13, Batchelder Dep. 19-20, 238:23-239:4 ("Based on his application and phone screen, . . . my understanding was that his subject matter areas of expertise were in enforcement."); Hughes Decl. ¶ 33(d) ("Mr. Mangayi's substantive child support experience was mostly in Enforcement."); Sage-Lowe Decl. 38-14 ¶ 24 ("During the screening, I understood that Mr. Mangayi's child support services experience was largely in Enforcement. If Mr. Mangayi had experience in areas such as Establishment, Paternity, Guidelines, and Modification, he did not share that during the screening."); Lepome Notes 2) (Mangayi was "[i]nterested [in the position] because worked as

an enforcement officer for 15 years and feels like he gained enough knowledge to take the next step. Thinks policy advisor is up his lane, is a scholar. To learn why policies are drafted and how they impact communities. Did bachelor's and masters degree and not have an opportunity to apply it yet.").) Emphasizing his background in child support enforcement, Mr. Mangayi's application for the Policy Advisor IV position uses the words "enforce" or "enforcement" no fewer than sixteen times. (*See generally* ECF No. 38-7, Mangayi Application.)

At the end of the phone screen process, based on similar low scores from all panelists, Mr. Mangayi ranked tenth among the twelve applicants who were invited to participate in the phone screen. (*See* ECF No. 44-5, 12/9/2024 CDHS's Response to Plaintiff's First Set of Interrogatories and Requests for Admission 8). He therefore was not asked to continue to the formal interview stage:

> Plaintiff was eliminated from consideration for the position after his phone screen. Plaintiff's responses during the May 10, 2023, phone screen ranged between average and below average. Plaintiff did not answer all questions clearly or concisely. Plaintiff repeated some parts of his answers to one question when answering the next question. Plaintiff did not effectively answer the questions posed. Plaintiff's scoring was low and similar across all panelists. He ranked tenth among the twelve applicants who were invited to participate in the phone screens conducted for the position. Thus, Plaintiff was not asked to continue in the process. The determination that Plaintiff would not advance past the phone screen was based on his phone screen and his responses to the questions posed, in comparison to other candidates.

(*Id.*) By contrast, at the end of the phone screen, Ms. Nash was ranked first among the candidates, just as she had ranked first at the end of the structured application review. (*Id.*)

## III. Racial Demographics of the Division and Policy Unit

Mr. Mangayi puts forward two sets of statistics regarding the racial makeup of the

Division generally and the Policy Unit specifically.

First, as of September 5, 2023, the 56-member Division had 34 white employees (60%); 17 Hispanic or Latino employees (30%); one employee who identified as "Two or More Races" (2%); one employee who identified as American Indian or Alaskan (2%); one Black employee (2%); and two Asian employees (4%).[6] (*See* ECF No. 49-1, Response to Investigator, CCRD Charge Number S2400020191x, Godwill Mangayi v. Colorado Department of Human Services 3-5; *see also* ECF No. 49 at 30, ¶ 6 (explaining that this document "provides a current list of employees as of September 5, 2023, and the start date of those then-current employees," and is "not a historical list of all Division employees dating back to 1990").) These statistics were provided by the CDHS Civil Rights Unit to an investigator for the Colorado Civil Rights Division related to Mr. Mangayi's charge of discrimination. (*See* CDHS Response to Investigator 2 ("Provide a list of all current employees, with relative protected class information, name, employment dates and job or position title.").) The Black employee working in the Division on September 5, 2023, had been employed there since January 6, 1990. (CDHS Response to Investigator 3-5.)

Second, as of February 13, 2025, all employees in the Policy Unit were white. (ECF No. 49 at 65, ¶ 73.)

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

[6] These approximate calculations were made by the undersigned judicial officer based on the undisputed record evidence.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation modified).

A movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim, but need only point the court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"To defeat a motion for summary judgment, [the nonmovant's] evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Id.* (quoting *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)); *accord Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) ("Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment."). When considering the evidence in the record, the court does not weigh the evidence or the credibility of witnesses, *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008), but "instead must only determine whether there is evidence in the record from which a rational jury

could find in the non-movant's favor," *Jane Doe 1 v. E. New Mexico Univ. Bd. of Regents*, 190 F. 4th 1270, 1278 (10th Cir. 2026) (citing *Anderson*, 477 U.S. at 257). At all times, the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

**ANALYSIS**

In his remaining claim, Mr. Mangayi contends that CDHS violated Title VII by refusing to hire him because of his race and national origin. (ECF No. 1 ¶¶ 29-37.)

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)). Because the record contains no direct evidence of race or national origin discrimination, the *McDonnell Douglas* framework guides the court's analysis of whether any genuine dispute of material fact requires a trial.

Under that approach, Mr. Mangayi "must first 'raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations.'" *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). To meet that burden, Mr. Mangayi must present adequate evidence to show that (1) he belongs to a protected class; (2) he

applied for an available position for which he was qualified; and (3) he "'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Laul v. Los Alamos Nat'l Laboratories*, 765 F. App'x 434, 440 (10th Cir. 2019) (to establish a prima facie case of failure to hire based on national origin, a plaintiff "must show that (1) he applied for an available position; (2) he was qualified for the position; and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination") (quoting *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1278 (10th Cir. 1999)). The Tenth Circuit Court of Appeals has emphasized that "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Burdine*, 450 U.S. at 253).

If Mr. Mangayi is able to meet his initial prima facie burden, which is "not onerous," *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) (quoting *Burdine*, 450 U.S. at 253), the burden then shifts to CDHS to offer a legitimate, nondiscriminatory reason for Mr. Mangayi's nonselection. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018). If CDHS articulates a satisfactory reason, the burden shifts back to Mr. Mangayi to present evidence sufficient to genuinely dispute that the CDHS's stated reason is a pretext for discrimination. *Id.* (citing *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)). To demonstrate the existence of a genuine dispute of a material fact concerning pretext, Mr. Mangayi's properly-supported evidence must evince "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in [CDHS's] proffered legitimate reasons for" its hiring decision such "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [CDHS] did not act for the asserted nondiscriminatory reasons." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (citation modified).

Having carefully examined the factual record pursuant to these standards, the court now respectfully finds that summary judgment in favor of CDHS is warranted.

## I. Prima Facie Case: Inference of Discrimination

For purposes of the Motion, CDHS does not contest that Mr. Mangayi belongs to a protected class or that he was qualified for the Policy Advisor IV position. (*See* ECF No. 38 at 24.) Instead, based on the undisputed material facts, CDHS argues that Mr. Mangayi's evidence is insufficient to satisfy his prima facie burden to show that his nonselection occurred under circumstances giving rise to an inference of discrimination. (*See id.*) Mr. Mangayi counters that an inference of discrimination motivated by his race and national original may be drawn from (1) his different, less positive, treatment than that afforded to Ms. Nash and Ms. Sage-Lowe; (2) alleged procedural irregularities in the phone screen process; and (3) statistics concerning the racial makeup of employees in the Division. (*See* ECF No. 44 at 21-31.)

Although Mr. Mangayi's prima facie burden is "not onerous," *Ames*, 605 U.S. at 309, he nevertheless has failed to meet it. He has adduced no evidence to support an inference of discriminatory motive underlying his nonselection for the Policy Advisor IV position.

### A. Alleged Differential Treatment

Mr. Mangayi argues that two white women—Ms. Nash, a competitor who was the

selectee for the Policy Advisor IV position, and Ms. Sage-Lowe, one of the panel members who evaluated his candidacy—were treated more favorably than him during the selection process. (*See* ECF No. 44 at 21-26.) The undisputed evidence concerning these points permits no inference of a discriminatory motive on either basis.

**1. Ms. Nash**

As to Ms. Nash, Mr. Mangayi asserts that an inference of discrimination may be drawn from the fact that Ms. Nash met with members of the phone screen panel before the phone screens occurred. (*Id.* at 21-25.) To be sure, Ms. Nash *did* have those meetings, at her initiative. She contacted Ms. Hughes, who spoke with her "via Google Meet, discussing the Policy Advisor position and the nature of the Unit's work." (Hughes Decl. ¶ 2.) On a second occasion, Ms. Nash spoke with Ms. Sage-Lowe and Ms. Clair after a work meeting. (Sage-Lowe Decl. ¶¶ 4-9.) Both Ms. Hughes and Ms. Sage-Lowe have averred that they would have been willing to speak with Mr. Mangayi (or any other potential applicant) about the Policy Advisor IV position, had he contacted them, but he did not. (Hughes Decl. ¶¶ 7-8; Sage-Lowe Decl. ¶¶ 12-13.)

This undisputed record demonstrates no discriminatory motive toward Mr. Mangayi on the part of CDHS. Mr. Mangayi has produced no evidence showing that Ms. Hughes or Ms. Sage-Lowe (or any other panel member) treated him differently from Ms. Nash by rebuffing his request for a meeting, telephone call, or any other form of contact to discuss the position. Rather, the record evidence shows that, in contrast with Ms. Nash, Mr. Mangayi did not take the initiative to reach out to anyone involved with the interview process, even though he would have received Ms. Hughes's message on ACSES and could have located her contact information—a decision by *Mr. Mangayi* that does not show any panel member "specifically *excluded* other

candidates from similar assistance, or in fact, refused any request by [Mr. Mangayi] or anyone else for advice." *See Brown v. Colorado Jud. Dep't*, No. 19-cv-03362-MEH, 2022 WL 326561, at *18 (D. Colo. Feb. 3, 2022), *aff'd*, 2023 WL 4743055 (10th Cir. July 25, 2023).

Moreover, the fact that Ms. Nash "was a very eager candidate who proactively contacted one or more hiring panelists about the position raises no inference of discrimination against [Mr. Mangayi]." *See id.* (finding that the response to this "very eager candidate," and one panelist's enthusiasm about the competitor's candidacy, were not evidence of "a motive to exclude [the plaintiff]," and concluding that, "[i]n part or in sum, I do not believe they are evidence of pretext"). Put otherwise, nothing in Ms. Nash's vigorous pursuit of the position—or the panelists' positive responses to her affirmative efforts to gain knowledge about the job—shows that any of them harbored a purpose to discriminate against Mr. Mangayi because of his race or national origin.

Mr. Mangayi's arguments lack merit. Starting with his attempt to distinguish the instant matter from *Brown*, he makes three points: that "the demographic makeup of the employees within the Policy Unit were all White," but in *Brown*, "individuals who were members of Ms. Brown's protected class were already working in the department in which Ms. Brown was seeking employment"; that the interview panel "met with multiple candidates in advance of the interview"; and that Ms. Brown was not initially "a top candidate" but was only later added to the list of interviewees. (*See* ECF No. 44 at 23.) These points were inconsequential to the *Brown* court's determination that pre-interview meetings with the candidate who was ultimately selected failed to support an inference of discriminatory motive.

What *was* critical to the court's assessment was that Ms. Brown failed to come forward

with evidence demonstrating that any panelist "reject[ed] any candidate's request for advice." *Brown*, 2022 WL 326561, at *18. Absent such evidence—and Mr. Mangayi likewise has presented none—no intent to discriminate on the basis of race or national origin may be inferred from the fact that panel members responded to Ms. Nash's proactive efforts to reach out to them, particularly in view of Mr. Mangayi's contrasting silence prior to the phone screen. Indeed, there is no evidence in the record suggesting that any of the panelists had any awareness of Mr. Mangayi and his interest in the position in the "pre-application" phase (*see* ECF No. 44 at 24), and that undisputed lack of knowledge further negates an inference of discrimination based on any panelist's pre-phone-screen communications with a candidate who voiced interest in the position.

In short, no evidence supports the conclusion that the existence of meetings between Ms. Nash and some panel members, and the absence of such meetings between Mr. Mangayi and any panel member, were driven by his race or national origin. Mr. Mangayi laments the fact that "the first question asked during the phone screen was squarely focused on the candidates' understanding of the nature of the position and their expectations for the role," and that Ms. Nash allegedly had the advantage over him in answering that question because she "had already met with" some panel members and had been provided information about "the nature of the position and the unit's type of work." (*See id.* at 22.) But no discriminatory animus reasonably may be divined from the fact that Ms. Nash took the opportunity, equally available to Mr. Mangayi, to more effectively prepare for the interview process by connecting with people in the Policy Unit

to discuss the position.[7]

In his response brief, Mr. Mangayi speculates about what might have happened had he taken the initiative to contact Ms. Hughes or another panel member in advance of his phone screen to learn more about the job, and he purports to establish "disputed issues of material" fact based on these hypotheses. (ECF No. 44 at 24.) Had he communicated with panel members, Mr. Mangayi argues, "there are disputed issues of material fact regarding whether the panel members would have provided Mr. Mangayi [the] same information as they provided to Ms. Nash." (*Id.*) Respectfully, that is a wholly unsupported proposition. Mr. Mangayi's insinuation that some indication of disparate treatment might have emerged if he had done something he indisputably did not do—and that might have supported an inference his nonselection was motivated by his race or national origin—is not competent summary judgment evidence. His "mere speculation, conjecture, or surmise" on this point is insufficient to meet his burden at the summary judgment stage. *See Self*, 439 F.3d at 1230.

Nor has Mr. Mangayi provided evidentiary support for his characterization of the sworn testimony of panel members—that they "would have spoken with [Mr. Mangayi] or replied to his emails with the same information" they provided to Ms. Nash (*see* Hughes Decl. ¶ 8)—as "unreliable" and "highly speculative." (ECF No. 44 at 25.) A sworn "affidavit[] or

[7] Mr. Mangayi asserts that, before the phone screen, the panel "had already met with Ms. Nash and *recommended* her for the Positions[.]" (ECF No. 44 at 22) (emphasis added). However, the record contains no evidentiary support for the contention that any panel member "recommended" Ms. Nash or served as a reference for her. On her application, Ms. Nash listed three references: Amanda Griffin, an evidence technician; Monica Gathercole, a child support court liaison; and Laurie Whitman, Larimer County Court Clerk. (Nash Application 3.) Ms. Nash noted that she was "referred by" two CDHS employees, Mary Clair and Kathryn Lepome (*id.* 5), but that fact suggests no discriminatory antipathy against Mr. Mangayi.

declaration[]" is reliable evidence on summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(a); Mr. Mangayi's guess about what he thinks these affiants actually would have said in a one-on-one conversation with him is not. The court is obliged to decline Mr. Mangayi's unsupported request to make an *unreasonable* inference in his favor, i.e., that the sworn, uncontradicted testimony of an affiant cannot be believed and must be discounted. *See, e.g.*, *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017) (summary judgment standard does not require the court to make unreasonable inferences in favor of the nonmoving party that are unsupported by the record).

Finally, on the differential treatment point, the court notes that Mr. Mangayi cursorily labels Ms. Nash a "*preselected* White female" (ECF No. 44 at 2, 24 (emphasis added)), but without any evidence or argument supporting that assertion. Insofar as Mr. Mangayi seeks to ground his Title VII claim on the supposed preselection of Ms. Nash, the evidentiary record permits no inference of discrimination on that basis.

"[P]reselection alone 'does not support the inference that the [defendant's] employment decision was motivated by [race]-based discrimination.'" *Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 673 (10th Cir. 2019) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (alterations in original)). But even if it did, no evidence of "preselection" may be discerned in the record here. Eleven candidates besides Ms. Nash (including Mr. Mangayi) were invited to participate in the phone screen, and Ms. Nash and five other candidates (excluding Mr. Mangayi and five others) proceeded to the interview phase of the process. (ECF No. 38-13, Batchelder Dep. 20, 239:5-12; 12/9/2024 Discovery Responses 8.) In the end, Mr. Mangayi and eleven other candidates made unsuccessful bids for the Policy Advisor IV position,

and there is no "evidence that [Mr. Mangayi] suffered uniquely among the other unsuccessful candidates" because he is a Black person of African national origin. *See Brown*, 2022 WL 326561, at *19 (citing *Sasser*, 772 F. App'x at 673). No inference of discriminatory motive may be drawn from the supposed "preselection" of Ms. Nash, nor has Mr. Mangayi identified of any other different treatment between him and Ms. Nash that supports an inference of discrimination.

**2. Ms. Sage-Lowe**

Ms. Sage-Lowe is the panel member whose home was located in a tornado-warning area at the time of Mr. Mangayi's phone screen. Mr. Mangayi's argument concerning Ms. Sage-Lowe's situation is somewhat difficult to make out, but the court understands him to assert that Ms. Sage-Lowe was treated more respectfully than him by being allowed to arrive at his phone screen late,[8] even though Mr. Mangayi was also "on the tornado warning." (*See* Mangayi Dep. 9, 142:14-16). He now claims disparate treatment on grounds that he "could have been given the courtesy" to reschedule his phone screen (*see id.* 9, 143:14-18), but the fatal flaw in this argument is that the factual record precludes any rational juror from inferring that any panel member acted with hostility based on Mr. Mangayi's race or national origin because the screen proceeded as scheduled.

The fundamental defect in Mr. Mangayi's characterization of the record is that he

[8] There is no genuine dispute that Ms. Sage-Lowe was able to participate in the entirety of the substantive questioning of Mr. Mangayi during the phone screen. She has attested to that fact (Sage-Lowe Decl. ¶ 18 (averral by Sage-Lowe that when she logged back into the screen after the weather advisory, "Ms. Hughes was finishing up the introduction portion of the script and none of the four questions we prepared had been asked")), and her contemporaneous notes confirm it. (*See* Sage-Lowe Notes 2-5 (reflecting that Sage-Lowe took notes regarding Mangayi's responses to each of the four scripted questions).)

indisputably did *not* tell the panel members he needed to stop the phone screen because of supposedly treacherous weather. (*See* Hughes Decl. ¶¶ 23-24 ("Mr. Mangayi did not tell us he needed to stop the phone screen due to the weather nor did Mr. Mangayi request to reschedule his phone screening due to the weather. If Mr. Mangayi, or any other candidate, would have made a request to reschedule their phone screen due to the weather, we would have accommodated that request.")). While he now complains that Ms. Hughes "did not make it clear that, if the interview was stopped, it could be rescheduled" (*see* ECF No. 44 at 25), no reasonable juror could infer that moving forward with the screen in the face of Mr. Mangayi's complete silence was the product of discriminatory animus. Title VII does not punish employers for failing to possess that kind of prescience.

### B. Alleged Procedural Irregularities in the Phone Screen Process

Mr. Mangayi next argues that "[a] jury could draw an inference of race and/or national origin discrimination from the accumulation of other issues combined with the phone screen issues." (ECF No. 44 at 27.) As support for this proposition, Mr. Mangayi asserts that he received a "[m]isleading notification" about the phone screen; that the panel stuck with the four scripted questions during his screen and asked him no others; that the length of his phone screen was shorter than the phone screens of other candidates; and that the use of video during the phone screen process allowed the "'all White' Policy Advisors" and other panel members to identify Mr. Mangayi as "a Black African male." (*Id.* at 27-29.)

It is the case that "[d]isturbing procedural irregularities" might give rise to an inference of discrimination. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018) (recognizing that "'disturbing procedural irregularities' can satisfy the requirements of a pretext

claim") (quoting *Garrett*, 305 F.3d at 1220); *see also, e.g.*, *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007) ("We have previously held that disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual.").[9] "In order to establish pretext based on a procedural irregularity, a plaintiff must identify an applicable written or unwritten policy or procedure that the employer failed to follow." *Cooper*, 296 F. App'x at 695-96 (observing that plaintiff pointed to no written policy and no evidence of an unwritten specific approach to progressive discipline) (citing *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007)); *Jaramillo*, 427 F.3d at 1312-13 (holding that failure to administer an examination that was not required "is not a procedural irregularity"). But even when a specific policy or procedure is in play, "'[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual.'" *Cooper*, 296 F. App'x at 695 (quoting *Berry*, 490 F.3d at 1222). And "procedural irregularities alone, even disturbing ones, are 'not enough to show pretext and thereby satisfy *McDonnell Douglas* without 'something more' to show that [an employer's] decision results from' prohibited bias." *Brown*, 2022 WL 326561, at *16 (quoting *Doe v. Univ. of Denver*, 1 F.4th 822, 832 n.8 (10th Cir. 2021)). That "something more" occurs when the

[9] Many of the cases in the Tenth Circuit evaluate the procedural irregularities question in connection with the pretext prong of the *McDonnell Douglas* analysis, but the same legal principles apply at the inference-of-discrimination step of the prima facie case. *See Stewart v. Physicians Support Servs., Inc.*, No. 14-CV-195-JED-FHM, 2017 WL 4274711, at *6 (N.D. Okla. Sept. 26, 2017) (recognizing that "[i]t is only where the violation of such a policy amounts to a 'disturbing procedural irregularity' that it may give rise to an inference of discrimination") (citing *Timmerman*, 483 F.3d at 1122; *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686 (10th Cir. 2008)).

procedural irregularity "directly and uniquely disadvantaged a minority employee" or applicant. *See id.* (quoting *Hamilton v. Oklahoma City Univ*., 563 F. App'x 597, 605 (10th Cir. 2014)).

Applying these standards here, the record is devoid of evidence of a deviation from any specific CDHS policy at all, let alone a deviance amounting to a procedural irregularity of such magnitude as to "directly and uniquely disadvantage[]" Mr. Mangayi because of his status as a Black man of African national origin.

### 1. Notification of the Phone Screen

Starting with the first irregularity posited by Mr. Mangayi, that there was a "misleading notification of the "phone screen' v. video interview" (ECF No. 44 at 27-28), he points to no evidence sufficient to raise a dispute that every candidate selected for the phone screen was obliged to schedule that screen on very short notice. Each of the twelve selected candidates was notified of the phone screen by email, sent in alphabetical order by the candidates' surnames, within twenty-five minutes of each other. (SUMF ¶ 39.) Every candidate was required to select a time for the screen either the same day or the next day. (*Id.* ¶ 40.) And even if the notification of the screen as a "video interview" was "misleading," as Mr. Mangayi claims (ECF No. 44 at 27), he has not shown that it was any more misleading to him than the other candidates.

Critically, the implication in Mr. Mangayi's papers that Ms. Batchelder, the Deputy Director, harbored some nefarious intent to trick the applicants into showing themselves on video so that she could "screen out" certain of them—presumably, as Mr. Mangayi suggests, minority candidates like himself (*id.*)—is devoid of evidentiary support. To the contrary, any reasonable juror would understand, based on the undisputed record evidence, that an administrative assistant had mistakenly described the screen as a video screen. Mr. Mangayi asserts that Ms. Batchelder

"had the power" to "disable" the screen before the screenings commenced (*id.* at 28), but no rational juror could conclude that her decision not to add confusion to the situation by doing that—and choosing instead to welcome the candidates to turn off their screens after the conversations commenced (*see* SUMF ¶ 59)—manifests discriminatory intent. The unsupported insinuation that Ms. Batchelder's actions indicated a plan to screen out a Black male applicant is constructed out of whole cloth; nothing about this scenario, as illustrated by the evidence submitted to this court, reflects a divergence from CDHS policy, much less evidence of a "disturbing" divergence that Mr. Mangayi must adduce at this stage to survive summary judgment. *Cf. Plotke v. White*, 405 F.3d 1092, 1106 (10th Cir. 2005) (concluding that the summary judgment record presented a genuine dispute where the "procedural irregularity" was the lack of documentation supporting a termination decision and included evidence that the decisionmakers "contriv[ed] and grossly exaggerat[ed]" the incident leading to the plaintiff's termination "as a means of exercising gender animus towards her"); *Fassbender*, 890 F.3d at 890 (in reversing a trial court's grant of summary judgment on a pregnancy discrimination claim, noting evidence of both a "procedural irregularity" in the form of shifting explanations for the employee's termination and discriminatory comments directed to her).

Put simply, innuendo premised on speculation about Mr. Batchelder's motivation, in the context of her otherwise benign actions impacting all candidates equally, cannot rationally support a jury finding of a "disturbing procedural irregularity." *See, e.g.*, *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1278 (10th Cir. 2007) ("In opposing a motion for summary judgment, '[s]peculation or hunches amidst rumor and innuendo will not suffice.'") (quoting *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005)). No inference of

discrimination can be drawn from the video component of the phone screen.

### 2. Scripted Questions and the "Subjectivity" of the Phone Screen

Mr. Mangayi has also failed to bring forward evidence of a "disturbing procedural irregularity"—based on minor adjustments, made in real-time and in response to each candidate's unique responses—to the four scripted questions asked during the phone screens. (*See* ECF No. 44 at 28.)

Mr. Mangayi asserts that he was asked no follow-up questions during the screen, while other candidates were asked more questions. (*Id.*) But his only evidence to support the latter point is based on the following colloquy between his counsel and Ms. Nash during Ms. Nash's deposition:

> Q How long was your interview?
> A Not long. I'm not very long-winded, so – and they had *maybe five or so questions*. It didn't take long.
> Q You think it was five, or do you remember how many?
> A *I don't remember exactly*.
> Q Okay. Do you remember if they asked you any followup questions?
> A I don't think they did at the screening.

(ECF No. 44-8, Nash Dep. 17, 71:14-23 (emphasis added)). Ms. Nash's uncertain recollection, nearly two years after the fact, that she "maybe" was asked five questions (and that no follow-up questions were asked), while the panel asked only the pre-planned four queries during Mr. Mangayi's screen, is insufficient to demonstrate the existence of a "disturbing procedural irregularity" that would allow a reasonable juror to infer discrimination against Mr. Manganyi on the basis of his race or national origin.

Nor has Mr. Mangayi presented evidence sufficient to genuinely refute the point, attested to by Ms. Hughes, that the *only* exception to a candidate being asked more than four questions

was if the "candidate did not provide a responsive answer to a scripted question and a panelist rephrased the scripted question in an attempt to obtain a responsive answer." (SUMF ¶¶ 44-46.) The evidence in the record shows that Mr. Mangayi provided responsive answers and so was asked only the four scripted questions, in accordance with the advance plan for the screens. While there is no genuine dispute that the panel here asked each of the applicants the same questions, "[t]here is no legal requirement that an interviewer ask all job applicants the exact same questions." *Brown*, 2022 WL 326561, at *20 (quoting *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005)). Even if the phone screen questions varied substantially, which indisputably did not occur, that would not be indicative of discriminatory antagonism, but rather of the diversity of professional backgrounds among the candidate pool—variations that logically required a certain amount of "give-and-take" in the interview process. *See id.* (quoting *Blise*, 409 F.3d at 868).

Turning next to Mr. Manganyi's objection to the specific questions the panel asked and how the panel scored the answers, the record again precludes a finding of a genuine, material factual dispute that requires a trial. In his summary judgment papers, Mr. Mangayi characterizes the scripted questions as "highly subjective and . . . not related to whether a candidate was qualified for the Positions," and asserts that the panelists could have utilized an unidentified, alternate "scoring criteria that was more applicable and relevant to the questions asked during the phone screen." (ECF No. 44 at 28.) Mr. Mangayi, however, fails to come forward with evidence explaining how he was particularly disadvantaged, as a Black man of African national origin, by the particular questions asked or the scoring procedure employed.

In evaluating the evidentiary record on this point, the court recognizes that while "'the

presence of subjective decision-making can create a strong inference of discrimination,' the use of subjective considerations by employers is 'not unlawful per se.'" *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1145 (10th Cir. 2009) (quoting *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981)). Regardless, while "*some* subjectivity is to be expected in every hiring decision[,]"

> Title VII does not do away with traditional management rights. An employer has discretion to choose among equally qualified candidates, provided that the decision is not based upon unlawful criteria. . . . Thus, we typically will infer pretext from the employers' use of subjective evaluation criteria in the hiring process only when the criteria on which the employers ultimately rely are *entirely* subjective in nature. And, in determining if this is so, we will carefully evaluate whether the opaqueness of the employers' hiring system makes it susceptible to unspoken discriminatory input.

*Conroy v. Vilsack*, 707 F.3d 1163, 1177-78 (10th Cir. 2013) (cleaned up); *see also Turner*, 563 F.3d at 1145. Thus, absent evidence of unfettered subjectivity and particular opacity in the hiring process, this court is prohibited from taking on the role of a "super personnel department" by "second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)). There is no such evidence in the instant record.

To the extent Mr. Manganyi argues that the hiring process at the phone screen stage was a pretext for illegal discrimination, he has adduced no evidence that would allow a rational jury to find that the process was "entirely" or "excessively subjective," where each applicant answered the same questions and the panelists ranked the responses using the same predetermined criteria for each candidate. (*See* SUMF ¶ 43; ECF No. 38-20 at 1.) This reflects an objective, rather than subjective, approach to evaluating the candidates. *See Turner*, 563 F.3d at

1145 (noting that the criteria the employer used to rate interviewees were not excessively subjective because "each applicant answered the same questions, and the interviewers ranked the applicants' responses using predetermined criteria from [the employer's] Interview Guide"); *id.* (citing *Santana v. City and County of Denver*, 488 F.3d 860, 866 (10th Cir. 2007) (concluding that although the interview process at issue was subjective, it was not discriminatory because "[t]he panelists asked every applicant the same three questions and then ranked the candidates based on their responses")); *Bauer*, 647 F.2d at 1043 ("the standards from which the selection committee made a choice were written down and in that sense were objective").

Additionally, the record demonstrates that the phone screen questions focused on key job-related areas, including the candidates' experience in the arena of child support policy, understanding of child support policy issues, and interest in policy work. The questions prompted the candidates to describe their specific, relevant experience. And the questions also allowed the candidates to emphasize—and the panelists to gauge—the candidates' interests, strengths, and weaknesses, so as to allow for identification of the candidate best-suited to support the work of the Policy Unit and most likely to succeed in a policy-focused role.

Similarly, it is apparent from the face of the written evaluation criteria that those standards were designed to focus the panel reviewers on the candidates' objectively-discernible knowledge and experience. (*See* ECF No. 44 at 11, ¶ 30.) Mr. Mangayi purports to raise a dispute as to this point, arguing that a jury could determine that the panel should have used "scoring criteria that was more applicable and relevant to the questions asked during the phone screen." (*See id.* at 28). But his disagreement with how the responses were evaluated, and his seeming preference for an unspecified different set of selection criteria, is not evidence sufficient

to support an inference of race- or national-origin-motivated discrimination. Neither Mr. Manganyi nor this court is permitted to impose on CDHS their views of preferable hiring standards or an ideal candidate-evaluation process, lest they erroneously assume the mantle of "super personnel department" and inappropriately take it upon themselves to second guess CDHS's business judgment—consistently held among all panel members—that Ms. Nash's qualifications were superior to Mr. Mangayi's for the Policy Advisor IV position. *See Young*, 468 F.3d at 1250.

Mr. Mangayi also suggests that discrimination may be inferred because the panelists did not use "a scoring scale from the State Personnel Board or DHS Standard Operating Procedures" (*see* ECF No. 44 at 17, ¶ 60), but he presents no evidence concerning what such a scoring rubric would have entailed or how the panelists failed to employ it. As Ms. Batchelder attested, the rating scale used by the panelists was provided by CDHS Human Resources "as a template," which the panelists were authorized to apply differently "depending on which tool in the comparative analysis process we're using and/or which question." (ECF No. 44-1, Batchelder Dep. 89, 205:7-18.) Based on the undisputed evidentiary record, no reasonable jury could conclude that the panel members implemented the rating scale in an intentionally discriminatory manner. The existence of pre-prepared, scripted questions and pre-set evaluation criteria demonstrates that the panelists "were not given discretion to determine the scope of the interviews," and Mr. Mangayi "points to no evidence suggesting the interviewers injected their own additional subjective criteria into the evaluation process." *Turner*, 563 F.3d at 1145-46 (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007) (in determining the subjectivity of an investigation of an employee, the "important question" is whether the

plaintiff's supervisor had "unfettered discretion" in determining the appropriate punishment)).

Moreover, insofar as the panelists were directed to evaluate the candidates' abilities that may not be precisely measurable in a mathematical sense—their critical thinking skills and their anticipated aptitude in applying relevant knowledge to the specific demands of the Policy Advisor IV position, say (*see* ECF No. 44 at 11, ¶ 30)—that also fails to support an inference of discrimination based on "excessive subjectivity" in the phone screen process. Interviewers may consider how responses to questions "supply insight as to adaptability and trainability" without transgressing the line into the excessively subjective. *See Turner*, 563 F.3d at 1146 (finding that "the competencies cannot be considered wholly subjective, as Turner contends, merely because they cannot be precisely quantified"). In *Turner*, the undisputed evidentiary record showed that "the interview questions and the candidates' agility in responding to identical inquiries were relevant to the candidates' qualifications; the evaluations made by the interview panels were not based on whims or unguided opinions." *See id.*; *see also Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006) (where the employer used an evaluation form that "included multiple mandatory areas for evaluation," the evaluation process was not "wholly subjective" even though these evaluation areas related to "soft skills"). The same conclusion is compelled by the record here.

Nor has Mr. Manganyi produced evidence demonstrating that the hiring process was particularly "opaque," so as to permit a reasonable jury to infer discriminatory animus. *See Conroy*, 707 F.3d at 1177-78. There was transparency in the evaluation system used by the panelists, reflecting that all candidates were asked the same questions and evaluated pursuant to the same criteria. The candidates were asked to convey their experience in the realm of "policy

analysis, implementation and/or evaluation skills" (SUMF ¶ 67), a focus that was previewed in the posting for the Policy Advisor IV position, which emphasized that the "Minimum Qualifications" for the position included three years "of professional experience in policy analysis, project management, or working in the Child Support Services program," and that the "Preferred Qualifications" for the position included "[e]xperience analyzing, implementing and evaluating policy, legislation and/or regulations." (ECF No. 38-1 at 2.) The implication in Mr. Mangayi's briefing that he was discriminatorily prevented from obtaining an understanding of what the position truly entailed is unsupported in the evidentiary record; no reasonable juror could make that finding.

The allegations of procedural irregularities, taken as a whole and construed to the maximum extent in Mr. Mangayi's favor, do not constitute sufficient evidence to allow a rational jury to infer discrimination by CDHS on the basis of Mr. Mangayi's race or national origin. Neither is his evidence adequate to allow a rational jury to conclude that CDHS's evaluation methods were "*entirely* subjective" or in any way "opaque." *See Conroy*, 707 F.3d at 1177-78. Mr. Mangayi accordingly has failed to demonstrate the existence of a jury-triable question of fact concerning pretext on the basis of purported procedural irregularities in the selection process.

### C. Statistical Evidence

Lastly, Mr. Mangayi argues that an inference of discrimination arises from statistical data he characterizes as "alarming." (ECF No. 44 at 30.) He asserts that "the Policy Unit is historically White," and that "the Division has also had one Black employee for the last thirty three years, and that employee is not in an executive or managerial role after her lengthy tenure." (*Id.*) Mr. Mangayi asserts that "[t]he lack of diversity in the Policy Unit is particularly

concerning given the important role the unit plays in formulating child support policy, which impacts all communities, including communities of color." (*Id.*)

As an initial matter, the sole document on which Mr. Mangayi relies for evidentiary support does not substantiate the broad conclusion he would have the court draw from it. The September 5, 2023 list of the racial makeup of Division employees is a snapshot in time as of that date—when there was one Black employee in the Division whose tenure commenced in 1990—not evidence that the Division "has only had one Black employee for the last thirty-three years." (*See* CDHS Response to Investigator at 3-5; *see also* ECF No. 49 at 30, ¶ 6) (explaining that "[t]he document provides a current list of employees as of September 5, 2023, and the start date of those then-current employees," and is "not a historical list of all Division employees dating back to 1990").)

In light of the narrowness of Mr. Mangayi's statistical presentation, the court finds this evidence inadequate to create a triable issue on the inference-of-discrimination prong of his prima facie case. While "statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class," *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991), "[s]tatistics taken in isolation are generally not probative of . . . discrimination." *Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995).

Here, Mr. Mangayi's solitary statistic is an isolated one that does not "focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Fallis*, 944 F.2d at 746. His submission of a discrete, point-in-time picture is not probative of whether CDHS discriminated against him in

deciding not to advance him to the next phase of the interview process for the Policy Advisor IV position. *Cf. Carney v. City and County of Denver*, 534 F.3d 1269, 1275-76 (10th Cir. 2008) (suggesting that "gross statistical disparities" may show pretext, but declining to decide whether the statistical disparities at issue were "gross" because the statistical sample was "mistakenly limited to black females"; was "not limited to a qualified applicant pool"; did not speak to the particular form of discrimination at issue; and provided "no indication whether the statistical disparities" cited by the plaintiff were "statistically significant"). And so Mr. Mangayi's isolated "numbers fail to provide any information regarding whether the decision not to hire [him], *and that decision alone*, 'involved discrimination on the basis of [race or national origin].'" *Turner*, 563 F.3d at 1147 (quoting *Bauer*, 647 F.3d at 1045) (emphasis added).[10]

* * *

In conclusion, as to a prima facie case of employment discrimination, Mr. Mangayi has failed to bring forward evidence that would allow to allow a rational jury to infer national-origin or race-based discrimination from CDHS's decision to select Ms. Nash instead of him for the Policy Advisor IV position. This evidentiary defect alone is enough for the court to grant summary judgment to CDHS.

---

[10] Mr. Mangayi also contends that CDHS has "distributed evidence that *Colorado's* child support policies, especially regarding enforcement, have had a negative and disparate impact on communities of color and low-income families" (ECF No. 44 at 30 (emphasis added)), but the documentation to which he cites is from a national publication that addresses neither Colorado policies nor policy impacts on persons of color specifically. (ECF No. 44-7 at 3-4.) Regardless, the point is not material to Mr. Mangayi's claim that he was not hired for the Policy Advisor IV position because of his race or national origin.

## II. Legitimate, Nondiscriminatory Reasons and Pretext

Even if Mr. Mangayi had identified evidence sufficient to raise an inference of discrimination at the prima facie stage, the court further finds that CDHS has satisfied its burden at the second step of the *McDonnell Douglas* test by articulating legitimate, nondiscriminatory reasons for its actions and that, at the third step, Mr. Mangayi has adduced no evidence that would permit a rational jury to conclude CDHS's reasons were a pretext for discrimination.

### A. Legitimate, Nondiscriminatory Reasons for Mr. Mangayi's Nonselection

At the second step of the *McDonnell Douglas* analysis, CDHS has satisfied its "exceedingly light" burden to identify legitimate, nondiscriminatory reasons for its decision not to hire Mr. Mangayi for the Policy Advisor IV position, *see Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017), which need only be legitimate and nondiscriminatory "on their face." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011); *see also Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (at this stage, the employer need only "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). While Mr. Mangayi satisfied the initial screening criteria for the Policy Advisor IV role, it is uncontested[11] that his qualifications did not closely track the specific requirements of the position. That discrepancy came to the fore during the phone screen and was conspicuous in comparison with Ms. Nash's more relevant work history and experience.

---

[11] The reader is referred to the undisputed facts concerning Ms. Nash's qualifications, and the panel's evaluation of those qualifications in comparison with Mr. Manganyi's credentials, set forth above in § II of the Undisputed Facts, which are incorporated and summarized here.

The undisputed facts show that Ms. Nash's experience across a broad range of child support disciplines neatly matched the requirements of the position. The panelists determined that Ms. Nash had extensive experience in the policy arena, which they deemed knowledge integral to the position. (*See, e.g.*, Nash Application 5; Nash Cover Letter 1; Hughes Decl. ¶¶ 33(a)-(c)); ECF No. 38-13, Batchelder Dep. 9-10, 167:25-168:5; SUMF ¶¶ 77, 95-103.) Ms. Nash also possessed several of the "preferred qualifications" for the job, including substantial experience in training and as a subject-matter expert in all aspects of ACSES. (*See, e.g.*, Nash Application 1-2; Nash Cover Letter 1-2; Hughes Decl. ¶¶ 33(a)-(c); SUMF ¶¶ 118-123.) As documented in the panelists' notes of Ms. Nash's phone screen, Ms. Nash was able to articulate how her experience correlated with the requirements of the position. (*See* Lepome Notes 3; Batchelder Notes 3; Sage-Lowe Notes 2; *see also* SUMF ¶¶ 136-138.) And the panel perceived that Ms. Nash articulately explained how her experience distinguished her from the other candidates, including her skills in the relevant subject-matter areas of policy, analysis, implementation, and evaluation, which she supported with specific examples of her work with business rules, interstate payment processing, and at all levels of the ACSES process.

Mr. Manganyi has not succeeded in raising a genuine dispute that the background and experience he possessed were different, and less relevant to, the Policy Advisor IV position than Ms. Nash's. (*See* Undisputed Facts § II(B), above (undisputed facts concerning Mangayi's candidacy and nonselection for the position).) His phone screen brought into sharp relief for the panelists the critical differences between his child support experience, predominantly in the enforcement realm (including in his then-role as a child support enforcement officer for Arapahoe County), and the policy-focused duties of the Policy Advisor IV role. His answers to

the panelists' questions revealed, accurately, that the focus of his experience was in the arena of enforcement and that his familiarity with policy issues was limited. (*See* SUMF ¶¶ 78, 83-85, 89-94; *see also* Mangayi Application (emphasizing Mangayi's enforcement experience).) The dichotomy between Mr. Mangayi's background and experience and the duties he would be required to perform as a Policy Advisor IV was repeatedly highlighted in the panelists' contemporaneous scoring notes and their sworn testimony in this litigation. (*See, e.g.*, ECF No. 38-13, Batchelder Dep. 19-20, 238:23-239:4; Hughes Decl. ¶ 33(d)); Sage-Lowe Decl. 38-14 ¶ 24; Lepome Notes 2.)

In comparison with Ms. Nash, Mr. Mangayi's experience with ACSES—a "preferred qualification" for the position—was more limited and focused on his role "as an end user of the program," while Ms. Nash had "both end user experience and increasing responsibilities and expanding roles regarding ACSES." (SUMF ¶ 108.) It was acknowledged that Mr. Mangayi had "good knowledge of ACSES" and "proficiency in ACSES" (*id.* ¶ 109), but Ms. Nash indisputably surpassed him in that she had served as a "subject matter and technical expert of ACSES to County staff" for six years and then, from April 2022 until the time of her application in April 2023, as an ACSES Operations Analyst III with CDHS. (*Id.* ¶¶ 112-113.)

In the training arena, too (another "preferred qualification" for the Policy Advisor IV position (*see* ECF No. 38-1 at 2), Mr. Manganyi had significantly less experience than Ms. Nash. While Mr. Mangayi had remotely assisted in "new worker training" on one occasion (SUMF ¶¶ 116-117), Ms. Nash had been engaged in training her co-workers and others since 2007, in multiple scenarios and myriad formats. (SUMF ¶¶ 118-123.)

A statement from Ms. Hughes concisely summarizes the panelists' essential concerns

about Mr. Mangayi's candidacy, each of which is supported by the record: Mr. Mangayi "expressed that he had years of child support experience," but "he failed to showcase how that could be applied in a policy advisor role," and he further was unable to articulate "how his experience exactly could relate in the context of a policy advisor position." (Hughes Dep. 18, 173:10-20; 181; *see also* Sage-Lowe Decl. ¶ 27 (stating that Mangayi "did not discuss his expectations of the role as a Policy Advisor or how his prior experience would prepare him for a role as a Policy Advisor" or otherwise "demonstrate that he had a true understanding of the position"); SUMF ¶¶ 130-131.) Along with the differences between Mr. Mangayi's career-long focus on child support enforcement and the core job responsibilities of a Policy Advisor IV, the panelists also assessed Mr. Mangayi's experience with ACSES and in training others to be significantly less than Ms. Nash's, and the factual basis for their conclusion is undisputed. (*See, e.g.*, Mangayi Application 2, 5-6; Mangayi Cover Letter 5; SUMF ¶¶ 108-110, 116-117.) Additionally, the panelists assessed the general quality of Mr. Mangayi's presentation during the phone screen as falling on the low end of the spectrum of candidate performances. The panelists consistently described his responses as repetitive and lacking in clarity and concision. As Ms. Hughes put it, Mr. Mangayi repeatedly emphasized his years of child support experience at the county level, which "wasn't necessarily responsive to the questions, and it kind of indicated that he didn't have a clear or a structured understanding of how that experience [in the county] would relate to the policy advisor position." (Hughes Dep. 16-17, 164:23-165:2.)

This court, having combed the summary judgment record, finds *no* evidence demonstrating that any of the panelists "held discriminatory attitudes or participated in past discrimination," *Turner*, 563 F.3d at 1146, and so the nondiscriminatory nature of the reasons for

not selecting Mr. Mangayi are undisputed. CDHS has satisfied its "exceedingly light" burden to identify legitimate, nondiscriminatory reasons for not advancing Mr. Mangayi past the phone screen stage.

### B. Pretext

Turning then to the third step of the *McDonnell Douglas* framework and the question of whether Mr. Mangayi has met his burden to come forward with sufficient evidence to raise a jury question as to whether CDHS's reasons for not hiring him were pretextual, the court respectfully finds that he has not. Just as CDHS's actions are insufficient to raise a triable issue on the inference-of-discrimination prong of Mr. Mangayi's prima facie case, they also do not raise a jury question when viewed through the lens of pretext.

#### 1. Pre-Screen Meetings with Panelists

First, Mr. Mangayi has failed to show that he was treated differently with regard to the run-up to the phone screen than Ms. Nash, who exercised initiative in reaching out to panel members in advance of submitting her application, or differently during the screen than Ms. Sage-Lowe, who participated in all substantive aspects of the phone screen (and who, as a current employee, was differently situated than Mr. Mangayi in any event). The record includes no evidence that any panel member rejected *any* candidate's request for advice, and Mr. Mangayi's sheer supposition that any panelist would have been unwilling to talk with him—or would have given him different information than that provided to Ms. Nash—is not competent summary judgment evidence. And "[t]he fact that [Ms. Nash] was a very eager candidate who proactively contacted one or more hiring panelists about the position raises no inference of discrimination against [Mr. Mangayi]." *See Brown*, 2022 WL 326561, at *19.

### 2. Alleged Procedural Irregularities

The undisputed factual record demonstrates the existence of a plausible, reasonable explanation for each alleged procedural irregularity that has nothing to do with intentional discrimination against Mr. Mangayi. (*See* Analysis, § I(B), above.) Regardless, these facts—even were the court to generously assume that they somehow reflect "irregular" conduct—cannot reasonably be deemed to rise to the level of the "disturbing" so as to constitute evidence of pretext. *See Timmerman*, 483 F.3d at 1122 (recognizing that "disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual").

To begin with the phone screen itself, recall that Mr. Mangayi objects to the initial miscommunication about the screen being conducted by video and implies trickery in the process. However, there is no evidence of discriminatory animus underlying this error.[12] He also contends that he should have been given more time to prepare for the screen and asks the court to find a disturbing irregularity in his being asked only the four scripted questions. But in these respects—and, the record shows, in all others—he was treated the same as the other candidates. These circumstances, while contrary to Mr. Mangayi's view of an ideal selection process, are at most mere inconveniences and not procedural irregularities that "directly and uniquely

[12] To the extent Mr. Mangayi argues that the panelists' seeing him on the video led them to conclude that "he was not a good 'fit' for the Policy Unit based on his demographics" (ECF No. 44 at 31), he presents no evidence to support that conclusory contention. The notion that the panelists would not have appreciated that the surname Mangayi could be of African national origin cannot reasonably be credited. Appreciating that, it is apparent that Mr. Mangayi's national origin did not affect the panel's assessment of Mr. Mangayi's candidacy at the structured application portion of the comparative review, and there is no evidence it impacted the panelists' evaluation of his phone screen performance, either.

disadvantaged" him as "a minority employee." *Hamilton*, 563 F. App'x at 605. The fact that other candidates were able to surmount these minor challenges and, from the panel's perspective, perform better than Mr. Mangayi on the phone screen, fails to support an inference of pretext.

**3. Phone Screen Questions and Scoring**

Nor may pretext be inferred from the questions asked of the candidates and the process by which the panelists scored their responses. Any interview-based selection process inherently carries with it some level of subjectivity, *see Turner*, 563 F.3d at 1145, but that is not enough to put the pretext question to a jury. Viewing the undisputed factual record here, no reasonable jury could conclude that the hiring process at issue was "opaque" and "*wholly* subjective," *see Conroy*, 707 F.3d at 1177-78 (emphasis added), where the same questions were asked of all candidates and their answers were evaluated pursuant to the same criteria. On this record, then, Mr. Mangayi has failed to present evidence that "the entire process [was] excessively subjective" so as to raise a triable issue concerning pretext. *See Brown*, 2022 WL 326561, at *19.

**4. Mr. Mangayi's Background and Experience**

The Tenth Circuit has made clear that "an employee's own belief that []he was the most qualified candidate for a position is not enough to show pretext." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1219 (10th Cir. 2022) (citing *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) ("[A]n employee's own subjective belief that she is . . . more qualified than another applicant is insufficient."); *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 799 (11th Cir. 2005) ("Rowell's personal belief that he was more qualified is not sufficient to demonstrate discriminatory intent.")). As a result, Mr. Mangayi's subjective belief that he was more qualified for the Policy Advisor IV position than Ms. Nash and all of the other candidates is insufficient to

raise a jury question. (*See* ECF No. 44 at 33 (asserting that Mangayi "was more qualified than the rest of the candidate pool").) At bottom, opinion evidence is all Mr. Mangayi has presented.

In Mr. Mangayi's view, the fact that he was not selected for a formal interview after scoring second highest on the "structured application" review of the candidates' application packets, which he deems more "objective" than the phone screen half of the comparative analysis (*see* ECF No. 44 at 33; Batchelder Dep. 49-50, 151:24-152:7), obliges the court to send the pretext question to a jury. (*See* ECF No. 44 at 33.) But he provides no evidentiary support, save his own characterization of the circumstances, for the proposition that the phone screen was somehow less objective than the structured application review of his papers, and this court has found that Mr. Mangayi has raised no genuine dispute that the phone screen was *not* so "excessively subjective" as to evince pretext. *See Turner*, 563 F.3d at 1145. Reviewers may evaluate a candidate differently at different points in the application process, which may be designed to elicit different types of information about a candidate, without acting with discriminatory intent; the fact that the reviewers here viewed Mr. Manganyi's application papers more favorably than his extemporaneous answers to the screening questions, without more, fails to demonstrate pretext. *See Jiang v. City of Tulsa*, 169 F.4th 1194, 1203 (10th Cir. 2026) (recognizing that "there's no pretext in different reviewers attaching different weight to different criteria"), *reh'g en banc denied*, 181 F.4th 1333 (10th Cir. 2026). "In fact, that's why employers often "employ more than one individual to evaluate subjective criteria," *id.*—precisely as CDHS did here.

While the court respectfully recognizes Mr. Mangayi's representation that he possesses a "depth of experience in, and passion about, child support matters" (ECF No. 44 at 33), "the

record is devoid of any 'facts showing *an overwhelming disparity* in qualifications' in his favor," and against Ms. Nash, as required to present a triable dispute on the pretext prong. *See Vazirabadi v. Denver Pub. Schs.*, No. 17-cv-01194-WJM-SKC, 2019 WL 2590936, at *15 (D. Colo. June 25, 2019) (quoting *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)), *aff'd*, 820 F. App'x 805 (10th Cir. 2020); *see also Sasser*, 772 F. App'x at 673 ("We will not draw an inference of discriminatory pretext 'based upon minor differences between plaintiff's qualifications and those of successful applicants; rather, there must be an overwhelming merit disparity.'") (quoting *Conroy*, 707 F.3d at 1172). This court has meticulously studied the evidence underlying the comparisons Mr. Mangayi has made with Ms. Nash and finds that they fall well short of this standard.

Mr. Mangayi also points to alleged inconsistencies in CDHS's reasons for not hiring him (*see* ECF No. 44 at 32), but the record contains no evidence of any consequential inconsistency that would allow "a reasonable factfinder" to "rationally find" CDHS's reasons "unworthy of credence." *See Swackhammer*, 493 F.3d at 1167. Per Mr. Mangayi, CDHS previously asserted that his "performance on the phone screen" was subpar in comparison with other candidates, but now CDHS contends that "it chose Ms. Nash over Mr. Mangayi because during her phone screen she demonstrated how her background experience made her most qualified for the Position." (ECF No. 44 at 32 (cleaned up).) But there is no logical inconsistency in CDHS's assessment that Mr. Mangayi's responses to the phone screen questions were inapposite, repetitive, and reflected a lack of understanding of the role of a Policy Advisor IV, while at the same time concluding from Ms. Nash's responses during the phone screen (and throughout the evaluation process) that she possessed relevant experience that placed her at the top of the candidate pool.

To the extent Mr. Mangayi contends there is evidence of pretext because CDHS focused on Ms. Nash's experience only near the end of the selection process, the court disagrees. Mr. Mangayi relies on a single statement from a discovery response: "*While not considered until the final hiring decision*, Ms. Nash's experience made her highly qualified for the position in which she was hired." (*See* 12/9/2024 CDHS Discovery Responses Verified by Batchelder 9, 28 (emphasis added).) But in light of the record, which clearly shows Ms. Nash's experience was considered by the panelists throughout the selection process, the court declines to consider this statement in isolation. Rather, in the context of the entire record, the statement cannot reasonably be interpreted as CDHS having set the candidates' "experience" aside until the final decision, nor can it rationally be construed to indicate shifting rationales as a cover for discrimination in choosing Ms. Nash over Mr. Manganyi. Viewing the record as a whole, it cannot genuinely be disputed that from the beginning of the process through its conclusion the panelists were presented with ample evidence that Ms. Nash's background and experience were a superior fit with the requirements of the Policy Advisor IV role. (*See generally* SUMF ¶¶ 95-138.) The full record evidence, including the application papers of Ms. Nash and Mr. Mangayi and the panelist's comparison of the two, supports the panelists' assessment that Ms. Nash possessed extensive, superior experience to Mr. Manganyi in the areas most relevant to the Policy Advisor IV position. The record permits of no genuine dispute on that point. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (citation modified).

Mr. Mangayi's assertion that CDHS manipulated the criteria for evaluating the candidates

over the course of the selection process, or that background and experience were ever not among CDHS's reasons for choosing Ms. Nash over him (and every other candidate), finds no support in the summary judgment record.[13] Taking the record as a whole, no rational trier of fact could find here evidence of an inconsistency of such significance as to render CDHS's legitimate, nondiscriminatory reasons for finding Mr. Mangayi an inferior candidate to Ms. Nash for the Policy Advisor IV role "unworthy of credence." *See Swackhammer*, 493 F.3d at 1167.

Ultimately, to support an inference of pretext, Mr. Mangayi was obliged "to come

---

[13] In a supplemental response to Mr. Mangayi's discovery request, CDHS laid out its multi-layered assessment of the disparity in relevant experience between Ms. Nash and Mr. Mangayi:

> Ms. Nash was hired as the Policy Advisor IV for the subject matter areas of Establishment, Paternity, Guidelines and Modification. *Plaintiff lacked direct experience* in these subject matter areas. *Plaintiff's substantive child support services experience* was in the subject matter area of Enforcement. Plaintiff's application and his phone screen reflected his *lack of experience* in the subject matter areas of Establishment, Paternity, Guidelines and Modification. Ms. Nash had direct experience in each of these subject matter areas including Establishment, Paternity, Guidelines and Modification. In response to the phone screen questions, *Ms. Nash highlighted the years of experience* she had establishing parentage and using the child support guidelines to establish and modify child support orders, both administratively and judicially. *Ms. Nash also had direct experience* in the subject matter area of Enforcement. Further, *Ms. Nash's qualitative experience* in child support services reflected that she assumed increasing responsibility throughout her career. Plaintiff's application and phone screen did not reflect that he had assumed increasing responsibility throughout his career. In addition to *his lack of experience in the relevant subject matters* of Establishment, Paternity, Guidelines and Modification, *Plaintiff's application and, more prominently, his phone screen reflected his lack of experience in policy-related work. Ms. Nash's application and phone screen reflected her experience in policy-related work*, both in her work with the Division of Child Support Services (DCSS) and in her prior positions with a local county child support services program.

(ECF No. 38-21, 3/18/2025 CDHS's Supplemental Response to Plaintiff's First Set of Interrogatories and Requests for Admission 2-3 (emphasis added).)

forward with evidence that [CDHS] didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *See Johnson*, 594 F.3d at 1211; *see also Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 991 (10th Cir. 2021) ("In assessing pretext, this Court examines the facts as they appeared to the decisionmakers, and we cannot second-guess [the employer's] business judgment—it matters not if [the employer's] reasoning was correct, just whether it honestly believed in the reason for the termination."). Based on the record evidence, no rational jury could conclude that the decisionmakers did not honestly believe that Ms. Nash's qualifications for the position exceeded Mr. Mangayi's.

### 5. Demographic Makeup of the Division and Policy Unit

Mr. Mangayi argues that "the pretextual nature of DHS' alleged justifications" is shown in the "statistical data" he has brought forward. (ECF No. 44 at 35.) For the same reasons that Mr. Mangayi's statistics fail to raise a triable issue on the inference-of-discrimination prong of a prima facie case (*see* Analysis, § I(C), above), likewise are they inadequate to show that his nonselection was a pretext for discrimination.

As discussed, the fatal deficiency in Mr. Mangayi's evidentiary presentation is that he has not attempted to eliminate nondiscriminatory explanations for the statistical evidence he presents—that there was one Black employee in the Division as of September 5, 2023, and that, at the time he was selected for a phone screen in May 2023, all of the employees in the Policy Unit were white. *See Fallis*, 944 F.2d at 746. He has not, for example, brought forward evidence demonstrating that nonminority CDHS employees were unqualified for the positions they held or that they were selected over objectively more qualified Black or other minority candidates. By failing to account for these and other potential variables, Mr. Mangayi's statistics do not support

an inference that his nonselection was a pretextual cover for discrimination against him.

### 6. Alleged Non-Compliance with CDHS Standard Operative Procedures

Mr. Mangayi next asserts that a jury could infer pretext from the all-white demographics of the interview panel and its purported non-compliance with a CDHS Standard Operating Procedure. As he puts it, "[d]espite DHS SOPs concerning diverse interview panels, the Deputy Director made no effort to have racially or culturally diverse people on the interview panel." (ECF No. 44 at 31.) This is another iteration of the "procedural irregularities" argument the court has found lacking to demonstrate pretext, and this version of it fares no better.

A plaintiff may be able to demonstrate pretext with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances. *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1082 (10th Cir. 2023). But an employer's failure "'to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual.'" *Id.* (quoting *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007)). Here, Mr. Mangayi has failed to provide evidence that CDHS acted contrary to a written policy in the first instance.

The language in the SOP directed to the CDHS hiring process speaks of diversity in terms of "*organizational* diversity on the panel(s)" and instructs the "Program" to "make their best effort to organize a diverse panel to conduct interviews." (ECF No. 44-4, 3/28/2022 Talent Acquisition Interview SOP at 3 (emphasis added)). Ms. Batchelder testified that "[t]here was organizational diversity" on the panel in that it "included multiple levels of the organization on the panel. It included employees who interacted with the vacant position." (ECF No. 49-4,

Batchelder Dep. 2-3, 192:15-193:4.) Mr. Mangayi presents no evidence that would allow a rational factfinder to conclude that the panel lacked the "organizational diversity" CDHS was directed to make its "best efforts" to achieve. And even if there had been some glitch or omission in following this internal procedure—which the record here does not indicate—that procedural irregularity would "evince[] pretext only if it 'directly and uniquely disadvantaged a minority employee.'" *Sasser*, 772 F. App'x at 672 (quoting *Johnson*, 594 F.3d at 1213); *see also Markley*, 59 F.4th at 1089 ("And 'for an inference of pretext to arise on the basis of a procedural irregularity, there must be some evidence that the irregularity *directly and uniquely disadvantaged [the employee]*.'") (quoting *Conroy*, 707 F.3d at 1176).

Here, no inference of a "direct and unique disadvantage" to Mr. Mangayi emerges from the uncontested record evidence. As with the other alleged procedural irregularities associated with Mr. Mangayi's nonselection, he has adduced no evidence showing that the purported disconnect between the SOP and CDHS's actions rises to the level of the "disturbing" so that a rational jury could draw from it an inference of pretext.

**7. Elimination of the Substitute Position**

Mr. Manganyi argues that, even if he was not hired for the Policy Advisor IV position, he could have been hired for an "S" or "substitute position." (ECF No. 44 at 33.) CDHS, however, has proffered undisputed evidence demonstrating that it eliminated the "S position" because, at the end of the recruitment process, it concluded there were not "two candidates that could be successful in the policy advisor role to hire. So we hired Elizabeth [Nash] into the establishment role, and we eliminated the S position because, by the time that we would be able to repost, Mary

Clair[14] would have vacated her position." (ECF No. 44-1, Batchelder Dep. 103, 235:13-20.) Mr. Mangayi labels this a ploy "to maintain the status quo of the all-White Policy Unit," and he contends that he "could have" learned the job duties of the S position because of his "depth of experience in, and passion about, child support matters[.]" (ECF No. 44 at 33.)

CDHS has explained that its assessment of the quality of the remainder of the candidates, after selecting Ms. Nash, prompted it to eliminate the S position. And it is not this court's role to "sit as a superpersonnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813-14 (10th Cir. 2000)). Mr. Mangayi's pretext argument on this point hinges on precisely this type of prohibited judicial second-guessing—about the qualifications of the candidates, the wisdom of eliminating the S position when only one qualified candidate emerged, and the decision to refrain from upending the configuration of the Policy Unit for the purpose of adding an employee who lacked the requisite qualifications—and so his evidence fails to establish a genuine dispute of material fact concerning pretext. Title VII does not permit the court to substitute its judgment, or the judgment of Mr. Mangayi, for that of CDHS in this manner. No inference of pretext can be drawn from the undisputed evidence regarding CDHS's decisionmaking here.

Nor has Mr. Mangayi identified evidence showing that CDHS lacked an honest belief in the veracity of its proffered reasons or that its selection of Ms. Nash over Mr. Mangayi was the

[14] It was the imminent retirement of Ms. Clair, who then held the Policy Advisor IV position, that had created the vacancy for which Ms. Nash and Mr. Mangayi applied.

best choice for both the Policy Unit and CDHS. But even if he had done that much, he has nevertheless failed to adduce evidence sufficient for a reasonable factfinder to conclude "that *discrimination was a determinative factor* in [CDHS's] actions[.]" *See Young*, 468 F.3d at 1250 (quoting *Miller v. Eby Realty Grp., LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005)).

Therefore, no inference of pretext arises from CDHS's decision to eliminate the S position or to decline to reconfigure the Policy Unit to create a position tailored to Mr. Mangayi's preferences.

**8. Alleged Implicit Bias of Ms. Batchelder**

Finally, Mr. Mangayi asserts that he has created a triable issue regarding pretext because Ms. Batchelder, the hiring manager, has taken an implicit bias assessment but does not remember the specific results of that evaluation. (ECF No. 44 at 30.) In her deposition, Ms. Batchelder testified that she is "sure" she has implicit biases because she "believe[s] everyone has them," but that she does not believe implicit bias was a factor in the selection process for the Policy Advisor IV position because "there were several aspects of the process that were aimed at eliminating that type of bias." (ECF No. 44-1, Batchelder Dep. 102, 234:8-15.) Mr. Mangayi argues that "[a] jury should decide whether the Deputy Director's implicit biases results in discriminatory hiring practices and those discriminatory hiring practices were applied in this case" (ECF No. 44 at 30), but the court cannot credit Mr. Mangayi's implicit bias argument because it rests entirely on speculative allegations without supporting evidence.

Mr. Mangayi would need to convince a jury not only that Ms. Batchelder may have suffered from an implicit bias toward him specifically, but also that CDHS's nondiscriminatory justifications for his nonselection—Ms. Nash's extensive experience in all relevant subject-

matter areas and, additionally, her possession of several "preferred qualifications" that Mr. Mangayi did not have—were actually pretextual. The undisputed facts here would prevent a rational jury from reaching such a conclusion, where the record contains no evidence whatsoever of discrimination. *See Kunik v. New York City Dep't of Educ.*, 842 F. App'x 668, 673 (2d Cir. 2021) (affirming summary judgment where "defendants never commented on [plaintiff's] age or religion, and she presented no evidence to support her speculative allegations that defendants harbored implicit bias towards her based on her age or religion"). In light of the record here, Mr. Mangayi's unsupported supposition about Ms. Batchelder's unspoken thoughts concerning his race and national origin is insufficient to create a triable issue regarding pretext.[15]

* * *

In sum, Mr. Mangayi has not directed the court to evidence sufficient "to raise a genuine doubt about [CDHS's] motivation" for Mr. Mangayi's nonselection. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1200 (10th Cir. 2000). The evidence he does present "permits nothing more than a speculative basis for believing discrimination was a

---

[15] Mr. Mangayi also fails to make clear how the concept of implicit bias, which the court understands to be a product of the unconscious mind, may bear on a Title VII plaintiff's ultimate burden to prove intentional discrimination. *See Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) ("To prevail on a Title VII discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer."); *cf. White v. BNSF Ry. Co.*, 726 F. App'x 603, 604 (9th Cir. 2018) (affirming a district court's exclusion of expert testimony on implicit biases because the plaintiff "never explained how testimony regarding implicit bias would be helpful to the jury in a disparate treatment case requiring evidence of intentional discrimination"). Using the Westlaw research platform, this court has located no case in which the Tenth Circuit has evaluated how potential implicit bias may bear on the requirement to prove intentional discrimination under Title VII. Regardless, given the paucity of evidence on which Mr. Mangayi's assertion of Ms. Batchelder's alleged implicit bias rests, the court need not address that unresolved issue.

motivating factor" in his nonselection, *Markley*, 59 F.4th at 1083, and that is insufficient to survive summary judgment. Neither has he produced evidence showing that CDHS's stated reasons for evaluating Ms. Nash as the superior candidate for the Policy Advisor IV role were implausible, inconsistent, or unworthy of credence. Accordingly, CDHS is entitled to summary judgment for these additional reasons.

## CONCLUSION

For the foregoing reasons, it is respectfully

**ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 38) is **GRANTED.** It is further

**ORDERED** that Claim One, brought under Title VII, is **DISMISSED with prejudice**. It is further

**ORDERED** that Claim Two, brought under the Colorado Anti-Discrimination Act, is **DISMISSED without prejudice**, as previously directed by the court (ECF No. 32). It is further

**ORDERED** that Defendant's Motion to Exclude Expert Testimony of Plaintiff Regarding Front Pay (ECF No. 37) is **DENIED as moot**. It is further

**ORDERED** that judgment shall enter in favor of Defendant and against Plaintiff, and that Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1. It is further

**ORDERED** that this case is closed.

DATED: November 9, 2026

BY THE COURT:

Susan Prose
United States Magistrate Judge